## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | |
|---|---|
| RENAL CARE GROUP INDIANA, LLC, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Cause No. 1:17-CV-65-HAB |
| CITY OF FORT WAYNE, | ) ) ) |
| Defendant. | ) |

## OPINION AND ORDER

This matter comes before the Court on competing cross-motions for summary judgment. Plaintiff filed its Motion for Summary Judgment on Counts III and IV (ECF No. 61) with Memorandum of Law in Support (ECF No. 62) on August 23, 2018. Defendant filed its Motion for Summary Judgment (ECF No. 76) and its Memorandum of Law in Opposition to Plaintiff Renal Care Group Indiana, LLC's Motion for Summary Judgment and in Support of Defendant City of Fort Wayne's Cross-Motion for Summary Judgment (ECF No. 77) on October 22, 2018. Plaintiff filed its Consolidated Reply in Support of its Motion for Summary Judgment on Counts III and IV, and Opposition to Defendant's Cross-Motion for Summary Judgment (ECF No. 86) on November 19, 2018. Defendant filed its Reply in Support of its Cross-Motion for Summary Judgment (ECF No. 89) on December 3, 2018.[1]

---

[1] Plaintiff also filed a Motion to Strike the City's Affidavit of Mary Ann Schaefer (ECF No. 85). Plaintiff appears to base its Motion to Strike on Federal Rule of Civil Procedure 56(c)(2), which states that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Because the Court can distinguish which exhibits, affidavits, and statements may properly be considered when deciding whether summary judgment is appropriate, the Court denies the Plaintiff's Motion to Strike. The Court has noted the Plaintiff's objections and will consider the objections to the extent they arise in the Court's summary judgment analysis.

The issue before the Court is whether Defendant, having improperly terminated the Patient[2] from its group health plan upon his eligibility for Medicare, is responsible to Plaintiff for breach of contract and statutory damages under the Medicare Secondary Payer Act ("MSPA"), 42 U.S.C. § 1395y(b). For the reasons set forth below, the Court concludes that Plaintiff cannot recover under the MSPA because Plaintiff has failed to demonstrate Defendant's obligation to make the contested payments. Accordingly, Defendant is entitled to summary judgment on Count IV. In addition, the Court concludes that Plaintiff has failed to establish the existence of a contract between itself and Defendant. As a result, Defendant is also entitled to summary judgment on Count III.

## FACTUAL BACKGROUND

Defendant operates the City of Fort Wayne Employee Benefits Plan[3] (the "Plan"), which provides health benefits to eligible employees and retirees. Like many such plans, the act of providing health benefits is achieved only through a complex system of contractual relationships between and among various parties. In this case, that system looks like the following:

- A Summary Plan Description, which is issued by Defendant to eligible participants and sets forth the rights and obligations of participants in the Plan;
- A Third-Party Administrative Services Agreement between Defendant and Automated Group Administration, Inc. ("AGA"), which names AGA as the third-party administrator for the Plan and sets forth, among other things, the terms on which health care provider charges will be paid;
- A Third-Party Administrator Agreement between AGA and Parkview Signature Care Network (the "Network"), which sets forth, among other things, the rates that will be paid for charges from health care providers that are "in-network" for the Network; and
- A Letter of Agreement between Plaintiff and the Network, which designates Plaintiff as "in-network" and sets Plaintiff's agreed compensation for "in-network" patients.

---

[2] The identity of the Patient is immaterial to the determination of the cross-motions, and therefore has been withheld to protect his privacy.
[3] The Plan is exempted from the requirements of the Employee Retirement Income Security Act ("ERISA") as a government plan under 29 U.S.C. § 1003(b)(1). This is true despite the Summary Plan Description's repeated references to ERISA, as government plans cannot "opt-in" to ERISA regulation. *Krystyniak v. Lake Zurich Comm. Unit Dist. No. 95*, 783 F.Supp. 354, 355-56 (N.D. Ill. 1991).

One participant in the Plan, the Patient, received treatment at Plaintiff's dialysis facility in Fort Wayne. The Plan provided health care coverage for the Patient from March 11, 2014, through May 31, 2014. During that time period, Defendant paid Plaintiff directly for the dialysis services that the Patient received from Plaintiff at an agreed upon rate set by the Letter of Agreement. On June 1, 2014, the Patient became entitled to Medicare coverage based on the Patient's end-stage renal disease ("ESRD") diagnosis. Because the Patient was newly eligible for Medicare, Defendant terminated the Patient's coverage under the Plan beginning on June 1, 2014. Defendant admits that it "took into account the Patient's eligibility for and entitlement to Medicare and terminated coverage for the Patient so that he would no longer be covered by the Plan beginning June 1, 2014." (ECF No. 6 at 8, ¶27).

After the Patient's coverage was terminated, he continued to receive dialysis treatment at Plaintiff's facility until his death in December 2017. Plaintiff submitted a claim to the Plan for dialysis services rendered on June 3, 2014, and June 5, 2014. AGA denied that claim on June 27, 2014.[4] No additional claims for dialysis treatment were submitted to the Plan until May 31, 2018, when Plaintiff submitted twenty-three claims for services provided to the Patient from June 2014 to November 2016. AGA denied those claims on June 15, 2018. With Defendant refusing to pay for the post-June 1, 2014, services, Plaintiff submitted bills to Medicare totaling $2,226,582.83. It is not clear whether this amount was reflected in the bills submitted to AGA, or whether there were additional, unsubmitted bills reflected in this amount. Medicare paid each of the bills and did not deny any of the claims.

---

[4] After AGA's denial, there was a series of correspondence between Defendant and Fresenius Medical Care North America ("Fresenius"), writing on behalf of Plaintiff, regarding the denial. The parties dispute whether Fresenius' letters constitute compliance with the appeal procedures set forth in the Summary Plan Document. This Court concludes that this case can be resolved without addressing the appeal procedures, and therefore a full recitation of the parties' correspondence is unnecessary.

## PROCEDURAL HISTORY

Plaintiff filed its Complaint (ECF No. 1) on February 23, 2017. In its Complaint, Plaintiff stated four causes of action arising out of Defendant's termination of the Patient from the Plan and Defendant's subsequent denial of Plaintiff's claims for services: (1) Declaratory Relief Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*; (2) Declaratory Relief Pursuant to the Indiana Uniform Declaratory Judgment Act, Ind. Code §§ 34-14-1-1, *et seq.*; (3) Breach of Contract; and (4) Violation of the Medicare Secondary Payer Act, 42 U.S.C. §§ 1395y, *et seq.* Defendant filed its Answer and Affirmative Defenses (ECF No. 6) on April 3, 2017.

On May 24, 2017, Plaintiff filed its Motion for Judgment on the Pleadings as to Count I (ECF No. 24) with supporting Memorandum of Law (ECF No. 25). Plaintiff argued, generally, that the admissions in Defendant's Answer established that it had terminated the Patient from the Plan because of his ESRD-based Medicare coverage, in violation of 42 U.S.C. § 1395y(b)(1)(C)(i).

This Court granted Plaintiff's Motion for Judgment on the Pleadings on November 2, 2017 (ECF No. 28).[5] This Court found, in relevant part:

> The Defendant has admitted that it runs a group health plan, that the Patient participated in the Defendant's group health plan, and that the Patient received health care coverage through the plan from March 11, 2014, through May 31, 2014. (Answer ¶ 2, 9.) The Defendant further acknowledged that from March 11, 2014, through May 31, 2014, the Plaintiff provided dialysis treatment to the Patient and submitted claims to the Defendant for payment, which the Defendant paid at a rate set by an insurance network. (Answer ¶¶ 23, 24.) Finally, the Defendant admitted that on June 1, 2014, the Patient became eligible for Medicare because of ESRD and that the Defendant terminated the Patient's coverage under the Plan because the Patient became Medicare-eligible on that date. (Answer ¶¶ 25–27.)
>
> The MSP Act and its accompanying regulations plainly prohibit a group health plan from terminating coverage when a member becomes Medicare-eligible based on an ESRD diagnosis. 42 U.S.C. § 1395y[(b)(1)](C)(i) ("[a] group health plan . . . may not take into account that an individual is entitled to or eligible for benefits under [the end stage renal disease program.]"); 42 C.F.R. § 411.161(a)(1) ("A [group health plan] may not take into account that an individual is eligible for or entitled

---

[5] As Plaintiff notes, judgment in favor of Plaintiff on Count I rendered Count II, submitted in the alternative, moot.

> to Medicare benefits on the basis of ESRD during the coordination period . . . ."); 42 C.F.R. § 411.108(a)(3) ("Actions by [group health plans] that constitute taking into account that an individual is entitled to Medicare on the basis of ESRD . . . include . . . [t]erminating coverage because the individual has become entitled to Medicare . . . .").
>
> * * *
>
> Under the MSP Act, a group health plan cannot terminate an individual's coverage during the 30-month coordination period that begins when an individual first becomes Medicare-eligible based on ESRD. . . . Therefore, the Defendant stands in violation of the applicable law.

(ECF No. 28 at 5–6, 7).

## LEGAL DISCUSSION

### A. STANDARD OF REVIEW

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable

inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Additionally, a court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

The fact that the parties have filed cross-motions for summary judgment does not alter the standard. When evaluating each side's motion, the court simply "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

**B.     THE MSPA**

With its determination that Defendant terminated the Patient's benefits under the Plan in violation of the MSPA in hand, Plaintiff asks this Court for summary judgment on Count IV of its Complaint seeking money damages under the MSPA. Defendant also seeks summary judgment on Count IV arguing that, while its termination of the Patient from the Plan may have been unlawful, it nonetheless is not liable to Plaintiff for damages. This Court agrees with Defendant.

To ensure reimbursement when Medicare makes conditional payments on behalf of a group health plan, the MSPA authorizes the United States to sue a delinquent primary payer for double damages. 42 U.S.C. § 1395y(b)(2)(B)(iii); *see also United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 875 (11th Cir. 2003) ("Medicare is empowered to recoup from the rightful primary payer (or from the recipient of such payment) if Medicare pays for a service that was, or should have been, covered by the primary insurer."). The MSPA also establishes "a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a

primary plan which fails to provide for primary payment (or appropriate reimbursement) . . . ." 42 U.S.C. § 1395y(b)(3)(A). In the event a private party bringing an action for damages under the MSPA is successful, the "United States shall be subrogated (to the extent of payment made under this subchapter for such an item or service) to any right under this subsection of an individual or any other entity to payment with respect to such item or service under a primary plan." 42 U.S.C. § 1395y(b)(2)(B)(iv); *Frazer v. CNA Ins. Co.*, 374 F. Supp. 2d 1067, 1077 (N.D. Ala. 2005) ("The statute provides that a private litigant who recovers a reimbursement for claims paid by Medicare and which have been denied by an insured defendant is required to turn over the amounts of such claim to the government."). The statute provides for double damages in order to allow Medicare to recoup any conditional payments, and to offer a reward to the private litigant bringing the action. *Frazer*, 374 F. Supp. 2d at 1080: *accord Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 525 (8th Cir. 2007) ("[W]ith the private right of action and the double damages, the beneficiary can pay back the government for its outlay and still have money left over to reward him for his efforts.").

The obligation to reimburse Medicare is triggered upon "demonstration" that the primary plan is responsible for those payments, as follows:

> A primary plan, and an entity that receives payment from a primary plan, shall reimburse the appropriate Trust Fund for any payment made by the Secretary . . . if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service.

42 U.S.C. § 1395y(b)(2)(B)(ii). The MSPA describes how that responsibility may be demonstrated:

> A primary plan's responsibility for such payment may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is an admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means.

7

*Id*.

As also discussed above, a primary plan that fails to pay or reimburse is subject to suit for double damages by the United States (*see* 42 U.S.C. § 1395y(b)(2)(B)(iii)) or by a private party (*see id*. § 1395y(b)(3)(A)), with the government having a right of subrogation for the amount of its conditional payment against the private party's recovery. *See id*. § 1395y(b)(2)(B)(iii)-(iv). However, the weight of the authority holds that the MSPA requires a primary plan to have a demonstrated obligation to pay before a private cause of action may arise. *Mason v. Am. Tobacco Co.*, 346 F.3d 36, 43 (2nd Cir. 2003); *Bio–Medical Applications of Tenn., Inc. v. Central States, Se. and Sw. Areas Health and Welfare Fund*, No. 2:08–CV–228, 2008 WL 5110800, at *1 (E.D. Tenn. 2008); *Stalley v. Erlanger Health Sys.*, No. 1:06–CV–194, 2007 WL 672301, at *5 (E.D. Tenn. 2007); *Stalley v. Sumner Reg'l Health Sys., Inc.*, No. 2:06–0074, 2007 WL 173686, at *6–7 (M.D. Tenn. 2007); and *Fresenius Med. Care Holdings, Inc. v. Brooks Food Group, Inc.*, No. 3:07CV14–H, 2007 WL 2480251, at *7–8 (W.D.N.C. 2007).[6]

Although the Court can find no Seventh Circuit precedent on this issue, the Eleventh Circuit addressed the "demonstration" requirement at length in *Glover v. Liggett Group, Inc.*, 459 F.3d 1304 (11th Cir. 2006), where the court held that the MSPA makes it a condition precedent to reimbursement that there be a demonstrated responsibility to pay for the items or services. *Id*. at 1309. The court stated as follows:

> Until Defendants' responsibility to pay for a Medicare beneficiary's expenses has been demonstrated (for example, by a judgment), Defendants' obligation to reimburse Medicare does not exist under the relevant provisions. Therefore, it cannot be said that Defendants have "failed" to provide appropriate reimbursement. Based on this language, we conclude that an alleged tortfeasor's responsibility for payment of a Medicare beneficiary's medical costs must be demonstrated before an

---

[6] *Fresenius* is particularly relevant because is involves essentially the same MPSA claim brought by an entity related to Plaintiff against a sponsor of an employee benefits plan.

8

MSP private cause of action for failure to reimburse Medicare can correctly be brought under section 1395y(b)(3)(A).

*Id*.

*Glover* further reasoned that, without this condition precedent, "defendants would have no opportunity to reimburse Medicare after responsibility was established but before the penalty attached." *Glover*, 459 F.3d at 1309. "To hold otherwise would open a primary insurer to double damages each time it contests a claim, rather than only when it fails to pay after responsibility has been established." *Fresenius*, 2007 WL 2480251, at *8.

This Court agrees with the foregoing authorities and finds that they defeat Plaintiff's MPSA claim. Regardless of the merits of Defendant's defenses to the payment of the disputed claims, there has been no demonstration, in this Court or elsewhere, that Defendant had an obligation as a primary payer. Without that demonstration, it cannot be said that Defendant has failed to reimburse Medicare such that Plaintiff has a cause of action under 42 U.S.C. § 1395y(b)(3)(A). If and when such a determination is made, Defendant should understand its responsibility to reimburse Medicare for funds which otherwise would not have been paid on the Patient's behalf. If, *at that time,* Defendant fails to reimburse the appropriate funds, then the MSPA allows for a private cause of action for double damages. However, that time is not now, and Defendant is entitled to summary judgment on Count IV of the Complaint.

## C. BREACH OF CONTRACT

### 1. DEFENDANT'S JUDICIAL AND EVIDENTIARY ADMISSIONS

In large part, Plaintiff's breach of contract claim is based upon what it characterizes as a series of admissions made by Defendant in its Answer and discovery responses that establish contractual breach. Not surprisingly, Defendant contests this characterization, and asserts that its responses do not stand for the propositions asserted by Plaintiff. After thoroughly reviewing the

9

contested portions of Defendant's Answer and its discovery responses, the Court sides with Defendant.

Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them. They may not be controverted at trial or on appeal. Indeed, they are "not evidence at all but rather have the effect of withdrawing a fact from contention." Michael H. Graham, *Federal Practice and Procedure: Evidence* § 6726 (Interim Edition); *see also* John William Strong, *McCormick on Evidence* § 254, at 142 (1992). A judicial admission is conclusive, unless the court allows it to be withdrawn; ordinary evidentiary admissions, in contrast, may be controverted or explained by the party. *Id*. When a party testifying at trial, during a deposition, or in discovery admits a fact which is adverse to his claim or defense, it is generally preferable to treat that testimony as solely an evidentiary admission. Michael H. Graham, *Federal Practice and Procedure* § 6726, at 536–37.

With that background, we can now turn to the claimed admissions. Plaintiff first asserts:

> The City admits that "[t]he amount the Plan pays for covered services is dictated by whether the medical provider is an 'in-network' or 'out-of-network' provider. Covered services provided by in network health care providers are paid according to the payment rate negotiated by the Parkview Signature Care Network because the City entered into an agreement with that network to pay in network health care providers at the negotiated network rates."

(ECF No. 62 at 4). Plaintiff is correct on this point; Defendant expressly admitted this fact in its Answer to paragraph 12 of the Complaint. (ECF No. 6 at 4–5).

Plaintiff next asserts that the City "admits that '[f]or claims for dialysis treatments from March 11, 2014, through May 31, 2014, the City paid RCG directly at the rate set by Parkview Signature Care Network." (ECF No. 62 at 8). Again, this is correct, and reflects Defendant's Answer to paragraph 24 of the Complaint. (ECF No. 6 at 8).

10

Plaintiff next asserts that the City "admitted that, had the City maintained coverage for the Patient through November 30, 2016, the City 'would [have] pa[id] the amount designated by the Parkview Signature Care Network contract." (ECF No. 62 at 8). This assertion is a closer call. Plaintiff cites to Defendant's Amended Answers to Plaintiff's First Set of Interrogatories, specifically Interrogatory No. 8. The relevant excerpt from that discovery response is as follows:

> 8. Describe how you would have calculated the payment for each Claim had the Patient's coverage remained in place from June 1, 2014, through November 30, 2016, and Plaintiff was able to submit the Claim to you for payment. Your response should include the mathematical formula or other details about the specific calculation that would apply to the Claims.
>
> ANSWER: The third party administrator (Automated Group Administration) would pay the amount designated by the Parkview Signature Network contract after the application of all co-payments, co-insurance, deductibles, etc.

(ECF No. 64 at 7). The question being posed in the Interrogatory is not what Defendant would have paid, but instead how would that payment have been calculated. Viewing Defendant's answer as responsive to the Interrogatory, *Scaife v. Boenne*, 191 F.R.D. 590, 594 (N.D. Ind. 2000) ("an answer to an interrogatory must be responsive to the question") (internal quotations omitted), Defendant's answer is an admission that the payments would have been calculated using the Network's contract, not necessarily that those payments would have been made.

Finally, Plaintiff attempts to bind Defendant to the testimony of AGA, asserting that AGA's representative testified that "the City would have paid RCG the Parkview Signature network [sic] rate, which is a percentage of RCG's billed charges." (ECF No. 62 at 8). The Court does not find that this assertion is supported by the designated evidence. Plaintiff has designated the Declaration of the President of AGA, Greg Ward. In relevant part, Ward's Declaration states that, on the basis of the relevant contracts,

11

> had RCG Indiana submitted claims to AGA for medical services provided between June 1, 2014, and November 30, 2016 (inclusive of those dates), and if those claims were covered by the Plan as the primary payer for the Patient in question, AGA would have calculated benefit payments for the Plan to pay those claims based on the Negotiated Rate . . . ."

(ECF 67 at 3, ¶ 7). Ward's testimony contains at least two caveats, says nothing about Defendant, and furthermore states only how AGA would have calculated benefit payments. Simply put, Plaintiff attempts to make Ward's testimony do far more than it does.

Taken together, the judicial and evidentiary admissions designated by Plaintiff establish that payments for covered services performed by in-network providers are calculated and paid by Defendant according to the rate established by the Network, and that Defendant made those payments while the Patient was covered by the Plan. The Court does not find that these facts, taken together, establish as a matter of law that Defendant is liable for breach of contract. Accordingly, to the extent Defendant can be held liable for breach of contract, that liability must be based on the relevant documents.

    2.    THE UNIFIED CONTRACT

Defendant's admissions aside, Defendant's liability to Plaintiff can only arise if one views the various contracts between Defendant, AGA, the Network, and Plaintiff as one, unbroken chain of contracts such that the chain can be treated as a single contract. Defendant largely waives off this potentiality, noting that it has no contract with Plaintiff, and that the intervening contracts all have provisions that restrict third-party rights. (ECF No. 77 at 11–13). While the Court finds that there is a chain of contracts, it does not find that the chain links Plaintiff and Defendant. Therefore, Defendant is entitled to summary judgment.

As Plaintiff points out in its Reply, there are multiple decision that interpret benefit-related contracts as one. In *Baylor University Medical Center v. Epoch Grp., L.C.*, 340 F. Supp. 2d 749

12

(N.D. Tex. 2004), a health care provider (Baylor) attempted to bring a breach of contract claim against a health plan claims supervisor (Epoch) for failure to pay medical claims. *Id*. at 751–52. As here, there were several contracts at play, including Subscriber Services Agreement between Epoch and Private Healthcare Systems, Inc. ("PHCS"), as well as a Hospital Services Agreement between PHCS and Baylor. *Id*. at 752. Epoch asserted a lack of privity between itself and Baylor and moved for summary judgment. *Id*. at 754. Baylor responded that the contracts should be read together, giving Baylor a direct claim against Epoch. *Id*.

The court agreed with Baylor. First, the court noted that "the instruments expressly refer to one another, showing an intertwined relationship between the parties and the instruments at issue." *Id*. at 755. Second, the court found that "all three instruments were required to complete the relationship between the parties." Specifically, the court found that,

> The Subscriber Services Agreement, which provided discounts from PHCS to Payors, could not operate effectively without PHCS contracting with providers through hospital services agreements. The very foundation of the discounts offered in Subscriber Services Agreement appears to be the agreements between PHCS and providers such as Baylor. Moreover, Payor Acknowledgments serve no apparent purpose other than to commit Payors to comply with the terms and conditions of the provider agreements.

*Id*.

Epoch, like Defendant in this case, attempted to avoid the interconnection of the contracts by citing to language limiting third-party rights. *Id.* at 755–56. The court rejected that argument, noting that the contracts also specifically contemplate payments from Epoch to Baylor. The court found that the only way to give effect to the contracts was to read them together, the third-party language notwithstanding. *Id*. at 756. In light of these findings, Epoch's motion for summary judgment was denied. *Id*.

13

A further example can be found in *IV Sols., Inc. v. United Health Care Servs., Inc.*, 2017 WL 6372488 (C.D. Cal. 2017). There, a health care provider (IV) brought an action against a health insurance company (United), seeking to recover approximately $47 million in unpaid claims. United sought to dismiss the action, arguing lack of privity. *Id*. at *11. Just as in this case and in *Epoch*, IV cited to a line of contracts including between United and a health care network (TRPN) and TRPN's contract with IV. *Id*.

Rather than view the contracts as a single contract, the *IV* court evaluated the dispute under a general third-party beneficiary analysis. The court noted that the agreement between United and TRPN had provisions requiring United to make payments to providers in the TRPN network (including IV). *Id*. at *12. Thus, the court concluded that IV was a member of an "expressly identified class to which a duty is owed," thereby conferring third-party beneficiary status. *Id*. The court reached this conclusion despite specific language in the agreements limiting third-party rights, stating that reliance on that language, "elevates form over substance. The inclusion of a boilerplate 'no third party beneficiaries' clause does not operate to disclaim any intent to create third party beneficiaries where the Network Access Agreement contains other more specific provisions suggesting the presence of just such an intent." *Id*. (quotations omitted). United's motion to dismiss was denied. *Id*. at 13.

While the foregoing cases superficially support Plaintiff's argument, the Court finds that they can only take Plaintiff so far. Much like in *Epoch*, the Third Party Administration Agreement is of little use without the Letters of Agreement. Indeed, the entire purpose of the Third Party Administration Agreement is to allow AGA and its clients to access the discounts negotiated in the Letters of Agreement. One need look no further than the Recitals to the Third Party Administrator Agreement which provide:

14

> WHEREAS, [AGA] has contracted or may contract with health benefits programs to arrange for the services of healthcare providers to persons insured by or otherwise entitled to benefits from or through such health benefit programs; and
>
> WHEREAS, [the Network] has created various products to provide cost-effective healthcare by promoting the use of services of certain physicians, hospitals, and other healthcare providers and facilities to health benefit programs; and
>
> WHEREAS, [the Network] has entered into contracts with Participating Providers, as hereinafter defined, to provide medical and healthcare services in a manner designed to contain the cost of such services; and
>
> WHEREAS, [AGA] wishes to contract with [the Network] so that the Participating Providers may provide such services to health benefit programs represented by [AGA].

(ECF No. 65 at 3) (*see also* Section 2.2 (*id.* at 6) Section 3.2 (*id.* at 10)).

The same is true in reverse, as the entire purpose of the Letter of Agreement is to allow healthcare providers to access clients of third-party administrators that have executed the Third Party Administration Agreement. Again, the Recitals are illustrative:

> WHEREAS, [the Network] is a part of an organized delivery system which desires to arrange for the provision of certain health care services for Member of Payor's health benefit plans and further desires to enter into a provider agreement with Participating Provider; and
>
> WHEREAS, Participating Provider is licensed or certified under the laws of the State of Indiana to provide Health Care Services; and
>
> WHEREAS, Participating Provider is prepared and willing to provide Health Care Services to Member according to the terms, conditions, and covenants of this Agreement.

(ECF No. 68 at 7). The Third Party Administration Agreement and the Letters of Agreement are undoubtedly intertwined and interconnected, and the Court has little trouble finding that they can properly be interpreted together.

The same cannot be said for the Third-Party Administrative Services Agreement. The Third-Party Administrative Services Agreement tasks AGA with performing a number of activities

for Defendant that have little, if anything, to do with Plaintiff's services. For instance, under the Third-Party Administrative Services Agreement, AGA agrees to:

- Provide plan documents, including a draft plan document, schedule of benefits, and Summary Plan Description (Section 1.03);
- Assist Defendant with the design and development of the plan (Section 1.05);
- Process medical expense claims (Section 1.06);
- Deny claims that are not covered under the plan (Section 1.11); and
- Pursue subrogation claims (Section 1.12).

(ECF No. 79 at 114–15). None of these services require the Network or Plaintiff to perform, nor do the Sections reference any of the other documents at issue in this case.

In fact, there is no reference to any kind of network agreement until page 7 of the Third-Party Administrative Services Agreement, under a part of the Agreement titled "Ancillary Services." There, under Section 8.04, the Agreement provides:

> Preferred Provider Organization Election – If the Employer elects the use of a Preferred Provider Organization (PPO), Employer agrees that AGA will provide assistance coordinating and implementing PPO services, and agrees to pay AGA the fees for providing said services as set forth in the Fee Schedule. AGA will submit payment on behalf of the Employer to the vendor and/or other applicable entity. Employer acknowledges that the costs associated with providing a PPO are the Employer's responsibility.

(ECF No. 79 at 120). The most noteworthy part of this Section is the very first word: "If." As written, the Third-Party Administrative Services Agreement does not require, nor does it necessarily contemplate, that Defendant would use a PPO for the Plan. It certainly does not specify the Network as the PPO, nor is there any discussion of the Third Party Administration Agreement or the Letters of Agreement. Unlike the agreements in *Epoch* and *United Health*, the agreement Defendant signed gave no indication that Defendant would be bound by the terms of separate agreements, and certainly did not put Defendant on notice of the terms Plaintiff claims were breached. The Third-Party Administrative Services Agreement, then, cannot be part of a unified contract in this case.

Stopping the chain of contracts at AGA is consistent with the relevant case law. In all the cases that the Court can find that address the "unified contract" theory in the context of employee benefits, no court has extended the theory beyond the party that contracts with the PPO network. *See, e.g.*, *Epoch*, supra; *United Health*, supra, *Roche v. Zenith Ins. Co.*, 2009 WL 635503 (S.D. Ill. 2009); *Scott & White Mem'l Hosp. v. Aetna Health Holdings, LLC*, 2018 WL 7377912 (W.D. Tex. 2018); *GPA Holding, Inc. v. Baylor Health Care Sys.*, 344 S.W.3d 467 (Tex. Ct. App. 2011). Given the close interrelation between the network agreements and the provider agreements, this stopping point makes sense. Here, that stopping point is AGA. Given the lack of any language in the Third-Party Administrative Services Agreement that references or incorporates the other agreements in this case, this Court will not extend the unified contract theory beyond its current bounds.

Moreover, the unified contract theory finds no support in Indiana law. As Plaintiff points out in its Reply (ECF No. 86 at 7, n.4), Indiana does apply the "contemporaneous contract doctrine," which states that courts will "construe together contracts that relate to the same transaction or subject matter, if nothing indicates a contrary intention." *Care Grp. Heart Hosp., LLC v. Sawyer*, 93 N.E.3d 745, 753 (Ind. 2018). However, this doctrine has limits. As stated by the Indiana Supreme Court:

> But when a litigant is not a party to one of the agreements, the contemporaneous document doctrine most likely will not apply. The reasons are straightforward: a contract generally cannot bind a nonparty, and assent to the terms of the contract is a basic tenet of contract formation. . . . The critical inquiry is whether the litigant who is absent from the cast of parties to one of the agreements is nevertheless "the same in essential respects" to a party to that agreement.

*Id*. at 753–54 (citations omitted).

Here, there is no basis to hold that Defendant is "the same in essential respects" as any of the parties to any of the other agreements. Rather, each party's role in the contractual framework is clear, and distinct from the other parties. Indeed, the Third-Party Administrative Services

17

Agreement expressly lays out the distinctions between Defendant and AGA, as well as their roles and responsibilities in the Plan. (ECF No. 79 at 114–117). The Court does not believe that the second largest city in Indiana is the same in any essential respect as a third party administration company, a health network, or a dialysis provider, and therefore, consistent with Indiana law, will not find a contract between Plaintiff and Defendant.

With no contract,[7] there can be no breach. *Collins v. McKinney*, 871 N.E.2d 363, 370 (Ind. Ct. App. 2007) (stating that a plaintiff in a breach of contract action must prove that "(1) a contract existed; (2) the defendant breached the contract; and (3) the plaintiff suffered damages as a result of defendant's breach."). Therefore, this Court finds that Plaintiff's breach of contract claim must fail, and that summary judgment should be entered for the Defendant on Count III of the Complaint.

3. DAMAGES

Even if this Court were to find the existence of a contract between Plaintiff and Defendant, and even if this Court were to conclude that the contract had been breached, the Court would nonetheless be compelled to find that Plaintiff has designated no evidence of any damages incurred. As damages are an essential element of a breach of contract claim, *Collins*, supra, summary judgment in favor of the Defendant would be warranted.

The entirety of Plaintiff's substantive argument on damages is confined to three sentences in its Memorandum of Law, wherein it states:

---

[7] The Court notes that Plaintiff, in its Reply, claims that "the City failed to respond at all to RCG's contention that the City is at least bound by an implied contract," and therefore that the existence of an implied contract has been admitted. (ECF No. 86 at 6–7). The only "contention" made by Plaintiff regarding an implied contract is a single reference in its Memorandum of Law that states, "Indiana law recognizes that a contract may be express or implied." (ECF No. 62 at 7). This is not a legal argument; it is a non-controversial statement of black letter law. The Court therefore concludes that Plaintiff's implied contract argument is undeveloped at best and has been waived. *Roe -Midgett v. CC Serv., Inc.*, 512 F.3d 865, 876 (7th Cir. 2008).

The City now owes RCG the amount due under the contract. The network contract[8] required that, if the City did not pay RCG the Negotiated Rate within 30 days, the City must pay 100% of RCG's billed charges. Having failed to pay RCG's claims at all, the City owes RCG its full billed charges, $2,226,582.83.

(ECF No. 62 at 9). Simply put, this is not how contractual damages work.

The appropriate measure of damages in a breach of contract case under Indiana law is "the loss actually suffered as a result of the breach." *City of Jeffersonville v. Envtl. Mgmt. Corp.*, 954 N.E.2d 1000, 1015 (Ind. Ct. App. 2011). The non-breaching party is not entitled to be placed in a better position than it would have been if the contract had not been breached. *Id*. Indeed, the non-breaching party, as a general rule, must mitigate his damages, and the breaching party has the burden to prove that the non-breaching party has not used reasonable diligence to mitigate its damages. *Ind. Indus., Inc. v. Wedge Prod., Inc*., 430 N.E.2d 419, 428 (Ind. Ct. App. 1982). Where a party mitigates its damages, the breaching party is entitled to set-off the amount of damages mitigated. *Id*.

Turning to Plaintiff's designated evidence, its proof of damages is confined to a single paragraph in the Declaration of Kelly Wood. (ECF No. 62-2). There, Wood testifies: "RCG's bills to Medicare for services provided to the Patient from June 1, 2014 through November 30, 2016, totaled $2,226,582.83. Medicare paid RCG for each of these bills and did not deny any of RCG's claims." (*Id*. at 2, ¶ 10). The logical inference from Wood's testimony, in the absence of any other evidence as to what Medicare paid, is that Plaintiff successfully mitigated all of its damages resulting from any breach[9]. After all, "Medicare paid RCG for *each* of these bills and did not deny

---

[8] Since the Court has determined that Defendant cannot be bound by the terms of AGA's contract with the Network, Plaintiff cannot look to that contract as a source of its damages.
[9] Medicare's repayment right under 42 U.S.C. § 1395y(2)(B)(ii) does not change this fact, because the obligation to repay does not arise until the Medicare payee "receives payment from the primary plan."

19

*any* of RCG's claims." Plaintiff has designated no other evidence to prove its contractual damages, and therefore has wholly failed to demonstrate this essential element of a breach of contract claim.

This is not to say that Defendant can completely escape its obligations, assuming those obligations have been breached. To the extent that Medicare wants reimbursed for its payments, and believes that Defendant is the responsible primary payer, it has the right to bring an action against Defendant under 42 U.S.C. § 1395y(b)(2)(B)(iii). It appears, however, that Medicare has shown no interest in doing so over the last two- and one-half years since the last contested service. Medicare's inaction, however, does not permit Plaintiff to attempt double-recovery in this Court.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment on Counts III and IV (ECF No. 61) is DENIED. Defendant's Motion for Summary Judgment on Counts III and IV (ECF No. 76) is GRANTED. The Clerk will enter judgment in favor of Defendant on Counts III and IV of Plaintiff's Complaint. Plaintiff's Motion to Strike the City's Affidavit of Mary Ann Schaefer (ECF No. 85) is DENIED.

SO ORDERED on May 29, 2019.

                                             s/ Holly A. Brady
                                            JUDGE HOLLY A. BRADY
                                            UNITED STATES DISTRICT COURT